UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

ADAM HADFIELD,

                         Petitioner,

         v.                                                    9:16-CV-0715
                                                               (MAD)

DALE ARTUS,

                         Respondent.

_____

APPEARANCES:                             OF COUNSEL:

ADAM HADFIELD
11-A-4648
Petitioner, pro se
Attica Correctional Facility
Box 149
Attica, NY 14011

HON. ERIC T. SCHNEIDERMAN          LISA E. FLEISCHMANN, AAG
Attorney for Respondent
Office of the Attorney General
120 Broadway
New York, New York 10271

MAE A. D'AGOSTINO
United States District Judge

## DECISION and ORDER

### I.    INTRODUCTION

Presently before the Court is petitioner Adam Hadfield's petition for a writ of habeas

corpus, filed pursuant to 28 U.S.C. § 2254.  *See* Dkt. No. 1, Petition ("Pet.").  He raises the

following grounds for habeas relief: (1) the trial court abused its discretion by finding him

competent to stand trial; (2) he was prejudiced by the testimony of two New York State

Troopers implying he had prior, uncharged crimes; (3) the evidence was insufficient; and (4)

trial counsel was ineffective.  Pet. at 5-26.[1]  Respondent opposes the petition.  Dkt. No. 13,

Answer; Dkt. No. 13-1, Memorandum of Law in Opposition to the Petition for a Writ of

Habeas Corpus ("R. Mem."); Dkt. Nos. 14 and 16, State Court Record ("SR").

For the reasons that follow, the petition is denied and dismissed.

## II.    RELEVANT BACKGROUND

Petitioner challenges an October 7, 2011 judgment of conviction in St. Lawrence

County, following a jury trial, of first degree criminal sexual act (5 counts) (N.Y. Penal Law

§130.50(1)); first degree unlawful imprisonment (N.Y. Penal Law §135.10); second degree

menacing (N.Y. Penal Law §120.14(1)); fourth degree criminal mischief (N.Y. Penal Law

§145.00(1)); second degree kidnapping (N.Y. Penal Law §135.20); first degree sexual abuse

(N.Y. Penal Law §130.65(1)); first degree rape (N.Y. Penal Law §130.35(1)); and driving

while intoxicated (N.Y. Veh. & Traffic Law §1192(3)).  Pet. at 1; Dkt. No. 16 at SR 144-50,

Indictment.

"Count 1 of the indictment-charging criminal sexual act in the first degree-pertained to

[petitioner's] sexual contact with victim A in March 2008."  *People v. Hadfield*, 119 A.D.3d

1217, 1218 (3d Dep't. 2014).  The "remaining counts of the indictment related to [petitioner's]

conduct with respect to victim B in July 2009."  *Id.*  The specific facts are known to the parties

and will be repeated only to the extent necessary to address petitioner's claims.

A competency hearing was held on January 1, 2011.  Dkt. No. 16-1, Hearing

Transcript ("H.") at 1.  The People called two witnesses, Dr. Lyle Montgomery, a psychiatrist

at the St. Lawrence Mental Health Clinic, and Dr. Anola Tanga, a staff psychiatrist at Claxton

---

[1]    The cited page numbers for the petition refer to those generated by the Court's electronic filing system ("ECF").

Hepburn Medical Center.  *Id.* at 1-2, 36-37.

Dr. Montgomery testified that she examined petitioner on September 21, 2009 and concluded that he was competent to stand trial.  H. at 19.  She reviewed legal documents pertaining to the charged crimes and medical records from the county jail before meeting with petitioner.  *Id.* at 3-5, 20-21.  The county jail's records contained a screening evaluation of petitioner conducted by Susan Riley, a counselor of the county mental health clinic, indicating petitioner was prescribed mood stabilizing drugs.  *Id.* at 6-7; *see* Dkt. No. 16 at SR 94-97, Montgomery Report.

During the interview, petitioner was cooperative and his responses to Dr. Montgomery's questions were appropriate.  H. at 8, 18.  He explained that he remembered the events leading up to the July 15, 2009 crimes, but was drinking and woke up in a jail cell unable to recall the events that resulted in his arrest.  H. at 8-9.  Petitioner explained the roles of the people involved in a criminal prosecution.  He told Dr. Montgomery that the prosecutor "provides evidence against" him, his attorney "defends" him, the judge "makes sure that everyone is doing everything inside the law," the jury decides "innocence or guilt," and that his own role was to help his attorney defend himself.  *Id.* at 10.  Petitioner also knew what charges he faced, and that a conviction could result in a sentence of life in prison.  *Id.* at 10-12.

Petitioner told Dr. Montgomery that he had behavioral and emotional difficulties since childhood, but did not receive any psychiatric treatment until he was in the Navy, where he was diagnosed with bipolar disorder and hospitalized for 6 months.  H. at 12.  He stated he bit a Navy officer on the neck.  *Id.*  Doctors at the Gouverneur Mental Health Clinic diagnosed petitioner with bipolar disorder and reported petitioner experienced trauma early in his life and

used drugs and alcohol.  *Id.* at 13-14.  But Dr. Montgomery concluded petitioner's symptoms seemed anxiety-related, and she found no "clear evidence for bipolar disorder" based on her assessment of petitioner.  *Id.* at 14.  She thought petitioner might have post-traumatic stress disorder, but was unable to definitively diagnose him because petitioner would not provide details about any early trauma.  *Id.* at 14-15.  Dr. Montgomery concluded that petitioner had chemical and alcohol dependency and an "underlying psychiatric disorder" characterized by "impulsive, violent behavior, auditory hallucinations, episodic suicidal ideations, anger, dysphoria, and anxiety, as well as evidence of anti-social behaviors."  H. at 24.

Dr. Montgomery further explained that although petitioner's symptoms could detract from his ability to assist his attorney, she believed he could still assist in his own defense because he could process information and relay it to counsel, he had logical thought processes and was connected to reality.  H. at 16-18.  Petitioner was not experiencing any "paranoid" or "grandiose" thoughts, or hallucinations.  H. at 16-18.  Dr. Montgomery also concluded that petitioner's self-reported "lapse of memory would make it more difficult" to assist in his own defense, but that factor alone was not enough to conclude petitioner lacked the "capacity to assist."  *Id.* at 16, 25-26, 29.

Dr. Anola Tanga, a staff psychiatrist at Claxton Hepburn Medical Center, also evaluated petitioner.  H. at 36-37; *see* Dkt. No. 16 at SR 190-91, Tanga Report.  Dr. Tanga testified petitioner was oriented as to time, place and date, and he understood the charges against him and the roles of the people involved in his prosecution.  H. at 39-42.  Petitioner told Dr. Tanga he was diagnosed with bipolar disorder and had an alcohol problem.  *Id.* at 44.  Dr. Tanga thought petitioner was depressed but he displayed no other symptoms of bipolar disorder.  *Id.* at 45-46.  His judgment and cognition were in tact and he was connected to

4

reality. *Id.* Dr. Tanga also diagnosed petitioner with bipolar disorder and alcohol abuse, but concluded the disorder and medications he was taking would not interfere with his ability to understand the proceedings or assist his defense because he understood the charges he faced and his sentence exposure. *Id.* at 48-50.

Petitioner called Dr. Ralph Johns, the chief psychologist at the St. Lawrence County Mental Health Services, to testify about his examination of petitioner. H. at 54. Dr. Johns reviewed records from the Gouverneur Hospital's Mental Health Clinic and the county jail's mental health treatment team. *Id.* at 54-56, 68. Petitioner understood court procedures, the charges against him, and the range of sentencing, and was able to relate to his attorneys. *Id.* at 61--63. He "did rather well on the competency to stand trial assessment instrument." *Id.* at 66. Dr. Johns did not firmly diagnose petitioner with bipolar disorder, but indicated that diagnosis "fit pretty well" with petitioner's history. *Id.* at 80-81. He believed petitioner's mental health issues would not alone impact his competency to stand trial. *Id.* at 81.

Dr. Johns was, however, concerned about petitioner's memory lapse and his ability to maintain his composure in court. For example, when he was interviewed by Susan Riley at the county jail, petitioner "threw" a table, but that incident was the only one during petitioner's incarceration. H. at 73-74, 78-79. Petitioner explained that when he experienced stress, he would hear voices, have "some degree of panic associated with it" and would then react in an "aggressive manner." *Id.* at 66-67. That pattern, in combination with petitioner's "lack of recollection of the events of the day of his arrest, were major complications" to providing a good defense. *Id.* Dr. Johns also opined that petitioner's memory loss did not "completely rule out" his ability to participate in his own defense because there were "other ways" to assist counsel. *Id.* at 77.

At the close of testimony, the trial court ruled petitioner was competent to stand trial. H. at 92-98.  The court first found that, based upon the assessments of all three doctors, petitioner understood the charges against him, the nature of the proceedings, and his sentencing exposure.  H. at 92.  The court noted Dr. Montgomery and Dr. Tanga each described petitioner as calm and cooperative, connected to reality, thinking logically and with "good judgment," and noted he did not have a "depressed mood" and was not paranoid, delusional, or suspicious.  *Id.* at 93.  The court further found that petitioner's potential for loss of composure could be controlled because, despite becoming agitated during his interviews with Drs. Montgomery and Johns, he nonetheless was "able to remain calm" and did not "lose control."  *Id.* at 94.  Petitioner's mental illness was "not a hindrance to his ability to understand the nature of the charges or to assist in his defense."  *Id.* at 95.  Petitioner's memory loss was "a problem," but he could review the "documents of the allegations," he was intelligent, and his knowledge of the witnesses who may be called to testify against him would be helpful in assisting counsel's questioning of those witnesses.  *Id.* at 95-96.  In sum, the court concluded petitioner demonstrated "his own understanding of the charges," had the ability to understand the sentencing range he faced, and had the "very good ability to be able to communicate with his lawyers and to understand the roles of everyone else in the process, such that his ability to assist in his defense is unhampered."  *Id.* at 97-98.

The case proceeded to trial on July 19, 2011.  Dkt. No. 16-3 at 1, Trial Transcript. Petitioner advanced a defense of not guilty by reason of mental disease or defect (pursuant to N.Y. Penal Law §40.15).  Dkt. No. 16-8 at 1096-1133; Dkt. No. 16-9 at 1134-1256, 1349. Dr. Thomas A. Lazzaro, a forensic psychiatrist, testified that on July 15, 2009, petitioner suffered from disassociative episodes secondary to borderline personality disorder and, as a

6

result, he lacked the "ability to comprehend the nature and consequences of his behavior or that it was wrong."  Dkt. No. 16-9 at 1146-47; Dkt. No. 16 at SR 198-203, Johns Report.

In rebuttal, the People called Dr. Gary Horwitz, a board certified private psychiatrist specializing in forensic psychiatry and addiction psychiatry.  Dkt. No. 16-9 at 1262; Dkt. No. 16 at SR 250-63, Horwitz Report.  Dr. Horwitz opined that although he could not rule out "minor episodes of dissassociation," petitioner's memory lapse was caused by an alcoholic blackout.  Dkt. No. 16-9 at 1288-1338.  He concluded petitioner knew and appreciated the nature and consequences of his conduct and that it was wrong, and explained that it was "extremely rare" for a person to enter a disassociative state.  *Id.* at 1288-89, 1314-38.

On August 1, 2011, the jury convicted petitioner of all of the charges except reckless endangerment, which was dismissed by the trial court at the close of the People's case. *Hadfield*, 119 A.D.3d at 1218; Dkt. No. 16-8 at 1085-86; Dkt. No. 16-10 at 1526-47.  On October 7, 2011, petitioner was sentenced to serve an aggregate term of 53 years in prison followed by 25 years of post-release supervision.  *Hadfield*, 119 A.D.3d 1217, 1218 (3d Dep't. 2014); Dkt. No. 16-11, Sentencing Transcript.  The "maximum term of imprisonment was reduced by operation of law to 50 years."  *Hadfield*, 119 A.D.3d at 1218 n. 1.

Petitioner appealed, and on July 24, 2014, the Appellate Division affirmed.  *Hadfield*, 119 A.D.3d at 1217-24.  The New York Court of Appeals denied leave to appeal on April 17, 2015.  *Hadfield*, 25 N.Y.3d 989 (2015).

This action followed.

## III.    DISCUSSION

### A.    Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision: (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. §§2254(d)(1), (2); *Cullen v. Pinholster*, 563 U.S. 170, 180-81, 185 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted)).

The Supreme Court has repeatedly explained that "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents.'" *Nevada v. Jackson*, __ U.S. __, 133 S. Ct. 1990, 1992 (2013) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see Metrish v. Lancaster*, __ U.S. __, 133 S. Ct. 1781, 1787 (2013) (explaining that success in a habeas case premised on § 2254(d)(1) requires the petitioner to "show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'") (quoting *Richter*, 562 U.S. at 103)).

Additionally, the AEDPA foreclosed "'using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.'" *Parker v. Matthews*, __ U.S. __, 132 S. Ct. 2148, 2149 (2012) (per curiam) (quoting *Renico,* 559 U.S. at 779). A state court's

findings are not unreasonable under §2254(d)(2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold." *Schriro*, 550 U.S. at 473.

Federal habeas courts must presume that the state courts' factual findings are correct unless a petitioner rebuts that presumption with '"clear and convincing evidence.'" *Schriro*, 550 U.S. at 473-74 (quoting § 2254(e)(1)). Finally, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits[.]" *Johnson v. Williams*, __ U.S. __, 133 S. Ct. 1088, 1096 (2013).

**B.    Ground One - Petitioner's Competency to Stand Trial**

Petitioner argues in Ground One of his petition that he was not competent to proceed to trial. Pet. at 5-14. He argues that the trial court's "failure to know what the burden of proof" for the hearing was "cast doubt upon its ability to make a proper determination." *Id.* at 12. He further asserts that the trial court should not have relied on the testimony of Drs. Lyle Montgomery and Anola Tanga because their opinions were "flawed," and the court should have instead credited his expert, Dr. Ralph Johns. *Id.* Petitioner's claims do not warrant federal habeas relief.

A criminal defendant may not be tried unless he or she is competent. *Pate v. Robinson*, 383 U.S. 375, 378 (1966). The standard for competence to stand trial is "whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the

proceedings against him.'" *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam)); *see Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial.").  A state court's conclusion regarding a defendant's competency is a factual determination that is entitled to a "presumption of correctness on federal habeas review." *Demosthenes v. Baal*, 495 U.S. 731, 735 (1990) (per curiam); *see Reed v. Duncan*, 326 F. App'x. 582, 584 (2d Cir. 2009). Questions of fact are analyzed to determine if they are "unreasonable ... in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The relevant inquiry is whether the state court reached an unreasonable conclusion of fact, i.e., one that is unsupported by the record.  *Surdis v. Kirkpatrick*, No. 9:11-CV-0537 (MAD/RFT), 2014 WL 4346613 at *6 (N.D.N.Y. Aug. 29, 2014).

Here, the Appellate Division rejected petitioner's claims, finding that after reviewing the expert reports and conflicting testimony presented at the competency hearing, there was "no basis upon which to disturb County Court's finding that defendant indeed was fit for trial." *Hadfield*, 119 A.D.3d at 1219.  The Appellate Division explained that petitioner was "evaluated by two psychiatrists (testifying on behalf of the People) and one psychologist (testifying on behalf of defendant)," and "[a]ll three evaluators found" that he "appreciated the nature and severity of the charges against him and understood the roles of the trial judge, the jury, the prosecutor and defense counsel." *Id.*  The Appellate Division further explained:

> As for defendant's ability to consult with his attorney, one of the People's experts acknowledged that defendant's claimed memory lapses "would make [assisting in his own defense] more difficult," and the psychologist who testified

> on behalf of defendant opined that defendant's asserted "lack of recollection [might] compromise his ability to testify relevantly or realistically challenge prosecution witnesses." Despite these concerns, two of the three experts found defendant to be competent to stand trial[.]"

*Hadfield*, 119 A.D.3d at 1219 (alterations in original).[2]  Those findings are supported by the record.  *See* Dkt. No. 16-1, H. at 10-11, 16, 24, 44-50, 59-67.  Petitioner has not presented "clear and convincing evidence" to rebut the presumption of correctness owed to the state hearing court's determination.  *See Surdis*, 2014 WL 4346613 at *6 ("[T]he trial court's objectively reasonable factual determination that Petitioner was competent to stand trial cannot be overturned by this Court" where the decision was supported by the record and the petitioner "failed to clearly and convincingly establish that the decision of the trial court was not fairly supported by the record.").

Petitioner appears to argue Dr. Johns's finding that his memory lapse about the July 2009 events, combined with his potential for loss of composure during trial, would impair his ability to assist counsel.  *See* Pet. at 11-14.  As the Appellate Division found, however, "the mere fact that a defendant may suffer a memory loss does not automatically trigger a finding of incompetency."  *Hadfield*, 119 A.D.3d at 1219; *see Surdis,* 2014 WL 4346613 at *5 n.3 (expert opinion that the "petitioner's episodes of disassociation, which affected his memory of the events relevant to the charges against him, would prevent him from assisting his attorney" did not "undermine the trial court's determination that Petitioner was competent" because "in New York a defendant's genuine amnesia of a crime does not implicate competence to stand trial.");  *People v Francabandera*, 33 N.Y.2d 429, 438-39 (1974) (defendant's genuine

---

[2]  In a footnote, the Appellate Division noted that Dr. Johns "conceded, however, that there were 'other ways in which'" petitioner "could assist counsel in challenging statements made by a witness."  *Hadfield*, 119 A.D.3d at 1219 n. 3.

amnesia of a crime does not implicate competence to stand trial); *People v. Bates*, 83 A.D.3d 1110, 1112 (2011) (noting "where a defendant suffers from memory loss, a court will not automatically find the defendant not competent to stand trial"), *lv denied* 21 N.Y.3d 1072 (2013).  The trial court ruled that petitioner's memory loss was "a problem," but petitioner could review the "documents of the allegations," he was intelligent, and his knowledge of the witnesses who may be called to testify against him would be helpful in assisting counsel's questioning of those witnesses.  Dkt. No. 16-1 at 95-96.  Those finding were also supported by the hearing record.  For example, Dr. Montgomery testified that petitioner could process information and communicate with his attorney despite memory loss, and that his thought processes were logical, he was connected to reality and was not experiencing paranoia or hallucinations.  H. at 16-19, 24-25.  Dr. Tanga also found petitioner displayed organized thinking, was connected to reality and his judgment and cognition were in tact.  *Id.* at 45-46. Petitioner's own expert testified that petitioner's memory loss was an "obstacle," but did not "completely rule" out that he could consult effectively with counsel.  *See id.* at 77.

Finally, petitioner argues that Dr. Johns's concern about petitioner's ability to maintain his composure in court "had merit" because when the verdict was read, petitioner punched himself and banged his head on the table.  Pet. at 13.  But petitioner's behavior occurred after he was ruled competent to stand trial and after the verdict was read.  Dkt. No. 16-10 at 1531, 1548.  There is nothing in the record to suggest that petitioner did not maintain composure during trial, or that he could not effectively assist counsel during trial.  *See* Trial Tr.

In sum, the Appellate Division's rejection of petitioner's competency claim was not contrary to or an unreasonable application of clearly established Supreme Court precedent, nor was it unreasonable in light of the evidence presented at the competency hearing.  28

U.S.C. § 2254(d)(2).  Ground One of the petition is therefore denied and dismissed.

### C.    Ground Two - Prior Uncharged Crimes

Petitioner alleges in Ground Two of the petition that the trial court erred when it admitted "evidence concerning [his] propensity to commit crime[.]"  Pet. at 15.  He first argues that the trial court improperly permitted Trooper Dean White to testify that he had prior encounters with petitioner and took him to an unrelated arraignment.  Pet. at 15.  Petitioner claims that even though the exact charge upon which he was previously arraigned was not revealed, the testimony informed the jury petitioner was previously charged with a crime and was, therefore, an "individual that generally deserves punishment."  *Id.*

Second, petitioner argues that the trial court improperly permitted Trooper Christopher Sharpe to testify he knew petitioner and previously pursued him after petitioner fired a gun in front of a house.  Pet. at 15.  He argues that although the testimony was stricken from the record and a curative instruction was given, the testimony "presented such a serious, violent, and dangerous crime, that the prejudice" to him "could not be erased by a limiting instruction."  *Id.*

At trial, Trooper White testified regarding his involvement in the investigation of the July 2009 crimes.  Dkt. No. 16-7 at 893-916.  On cross-examination, Trooper White stated that the dispatch center told officers to look for "Adam Hadfield."  *Id.* at 912.  Petitioner's counsel asked Trooper White if he knew "that person at that time."  *Id.*  Trooper White responded, "I had encounters with him before.  I had taken him to arraignment, so I knew who he was."  *Id.*  The prosecutor attempted to elicit details about the arraignment, but the trial court sustained defense counsel's objection to her line of questioning.  *Id.* at 915-16.

Trooper Christopher Sharpe testified he had known petitioner for approximately 10

years, and he stopped petitioner the night of July 15, 2009.  Dkt. No. 16-7 at 927-28; Dkt. No.

16-2 at 929-41.  On cross-examination, counsel asked Trooper Sharpe if, during the time he

had known petitioner, he had "ever seen him the way he acted on July 15, 2009?"  Dkt. No.

16-2 at 937.  Trooper Sharpe replied, "Yes," but confirmed he never saw petitioner bang his

head on a truck or try to bite a dog before that night.  *Id.* at 937-38.  On redirect examination,

the prosecutor asked Trooper Sharpe what he meant when he testified he saw petitioner act

in a similar way before July 15, 2009.  *Id.* at 940-41.  Trooper Sharpe responded:

> I was in a pursuit with him approximately about a year earlier where he had shot
> a gun off in front of a house, and we got in pursuit with him.  I chased him all
> night.  He drove like a champ, and ended up turning himself in the next day.

*Id.* at 941.  Defense counsel objected, and the trial court gave the following instruction to the

jury:

> Ladies and Gentlemen, the objection is sustained.  You're to disregard all the
> trooper's testimony about the previous incident in which he was involved with
> the defendant.  Has nothing to do with whether or not the defendant is guilty or
> not guilty in this case.

*Id.* at 941.

On direct appeal, the Appellate Division rejected petitioner's challenge to the

admission of the testimony of both Trooper White and Trooper Sharpe.  *Hadfield*, 119 A.D.3d

at 1223.  The court noted that "the testimony attributable to State Trooper Dean White was

elicited by defense counsel on cross-examination."  *Id.*  The Appellate Division also explained

that counsel "promptly objected" to the challenged testimony given by Trooper Sharpe, and

the trial court sustained the objection and gave a curative instruction.  *Id.*  The Appellate

Division concluded that, "[u]nder these circumstances, we do not find that the claimed

14

evidentiary errors deprived defendant of a fair trial." *Id.* at 1223. That decision was not contrary to or an unreasonable application of clearly established Supreme Court precedent.

The Supreme Court has not decided whether the admission of "prior crimes" evidence violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991) ("[W]e express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."). Thus, the Appellate Division's rejection of this claim cannot be contrary to or an unreasonable application of clearly established Supreme Court precedent. *Id.; see Wright v. Van Patten,* 552 U.S. 120, 126 (2008) (per curiam) ("Because our cases give no clear answer to the question presented, let alone one in Van Patten's favor, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.") (alteration in original, internal quotation marks and citation omitted).

In any event, state court evidentiary rulings, even if erroneous under state law, generally do not rise to the level of a constitutional violation unless the error "was so pervasive as to have denied" the petitioner "a fundamentally fair trial[.]" *Smith v. Greiner*, 117 F. App'x. 779, 781 (2d Cir. 2004) (quoting *Collins v. Scully*, 755 F.2d 16, 18 (2d Cir. 1985)); *see Estelle*, 502 U.S. at 67-68 ("we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Dowling v. United States*, 493 U.S. 342, 352 (1990) (to warrant relief based on alleged erroneous admission of evidence, petitioner must show its admission was "so extremely unfair" that it "violates fundamental conceptions of justice.") (citation omitted); *Linton v. Bradt*, 775 F. Supp. 2d 574, 577 (E.D.N.Y. 2011) ("A State court's evidentiary rulings, even if erroneous under State law, generally do not present constitutional issues cognizable in a habeas corpus

petition.") (citing *Crane v. Kentucky*, 476 U.S. 683, 689 (1986)).  A petitioner must show that the evidence was erroneously admitted, and that it was "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Cordon v. Greiner*, 225 F. App'x. 13, 15 (2d Cir. 2007) (quoting *Collins*, 755 F.2d at 19).  In other words, the evidence must have been "crucial, critical, [and] highly significant." *Collins*, 755 F.2d at 19 (citation omitted).  Petitioner has not made the required showing.

In this case, as the Appellate Division noted, Trooper White's challenged testimony was elicited not by the prosecutor, but by defense counsel.  *Hadfield*, 119 A.D.3d at 1223.  The trial court did not permit the prosecutor to elicit details about the prior arraignment.  Dkt. No. 16-7 at 912-13.  Trooper Sharpe's testimony was stricken and the trial court gave the jury a curative instruction.  *See id.*  The jury is presumed to have understood and followed those instructions.  *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993); *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).  Finally, there is nothing in the record to suggest petitioner was convicted based on any propensity to commit crime instead of on the trial evidence.  *See People v. Molineux*, 168 N.Y. 264, 291 (1901).  As respondent points out, petitioner did not deny that he committed the crimes but, instead argued he was not culpable because he suffered from a mental disease or defect.

In sum, the Appellate Division's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  Ground Two of the petition is therefore denied and dismissed.  *See, e.g., Smith*, 117 F. App'x. at 781 ("Given the strength of the evidence in the record against Smith, we cannot say that the admission of his past convictions, if erroneous, was sufficiently material that it removed a reasonable doubt or provided a basis for conviction.").

16

### D.    Ground Three - Sufficiency of the Evidence

Petitioner argues in Ground Three of his petition that the evidence was insufficient to support his convictions. Pet. at 17-23. The Appellate Division's rejection of petitioner's claims was not contrary to or an unreasonable application of clearly established Supreme Court precedent.

The Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crimes with which he is charged. *Jackson v. Virginia*, 443 U.S. 307, 315 (1979). Evidence is sufficient to support a conviction whenever, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Parker*, 132 S. Ct. at 2152 (quoting *Jackson*, 443 U.S. at 319) (emphasis in original). This inquiry "does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis in original). "[I]t is the responsibility of the jury-not the court-to decide what conclusions should be drawn from evidence admitted at trial[.]" *Parker*, 132 S. Ct at 2152 (quoting *Cavazos v. Smith*, 565 U.S. ——, ——, 132 S. Ct. 2, 4 (2011) (per curiam)). Importantly, a federal habeas court may not overturn a state court decision rejecting a sufficiency of the evidence challenge "simply because the federal court disagrees with the state court." *Coleman v. Johnson*, __ U.S. __, 132 S. Ct. 2060, 2062 (2012) (per curiam) (citation omitted). Instead, "a state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the decision was objectively unreasonable." *Parker*, 132 S. Ct. at 2152 (quoting *Cavazos,* 132 S. Ct. at 4 (2011) (internal quotation marks

17

omitted).

### 1.    The criminal sexual act conviction related to victim A

Petitioner first alleges that the evidence was insufficient to sustain his conviction for first degree criminal sexual act under Count One of the Indictment because there was no proof of either anal sexual contact or forced anal penetration of victim A except for her testimony, which he asserts was incredible.  Pet. at 17.

To sustain petitioner's conviction, the state had to prove that he engaged in anal sexual conduct with victim A by forcible compulsion.  N.Y. Penal Law §130.50(1).  As relevant here, "forcible compulsion" means to compel by physical force.  N.Y. Penal Law §130.00(8)(a); *see Hadfield*, 119 A.D.3d at 1219.  The Appellate Division summarized the evidence presented at trial in support of this conviction:

> Victim A, who had been dating defendant for three or four months at the time the incident occurred in March 2008, testified that she awoke on the morning in question to find defendant attempting to have sex with her. When victim A refused his advances, defendant pinned her arms above her head, removed her underwear and, despite her continued protests, engaged in anal sex with her. Victim A further testified that, during this encounter, defendant's hand or body pushed her head into her pillow, making it difficult for her to breathe.

*Hadfield*, 119 A.D.3d at 1219-20.  As the Appellate Division ruled, that evidence - supported by the record - was sufficient to establish the necessary elements of first degree criminal sexual act.  *Id.* at 1220; *see* Dkt. No. 16-7 at 786, 794-813, 815-20, 822-33, 836-43.

To the extent petitioner argues the evidence was insufficient because victim A was not credible, that argument implicates the weight of the evidence.  Weight of the evidence claims are not cognizable on federal habeas review because those claims are grounded in the state criminal procedure law.  *McKinnon v. Super., Great Meadow Corr. Fac.*, 422 F. App'x. 69, 75 (2d Cir. 2011).  Moreover, as the Appellate Division explained, victim A's credibility was "fully

explored at trial," and the court properly deferred "to the jury's resolution of the underlying credibility issues." *Hadfield*, 119 A.D.3d at 1220 (citing *People v Littebrant*, 55 A.D.3d 1151, 1154-1155 (2008), *lv. denied* 12 N.Y.3d 818 (2009)); *see* Dkt. No. 16-7 at 839-43; *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) ("assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; we defer to the jury's assessments of both of these issues.").

In sum, petitioner's challenge to his conviction of first degree criminal sexual act under Count One of the indictment related to victim A is denied and dismissed.

**2.    The July 2009 charges (Counts 2-3 and 5-13 related to victim B)**

Petitioner was convicted of several crimes, charged in Counts 2 and 3 and Counts 5 through 13, for events that took place in July 2009 related to victim B.  To the extent petitioner argues that the evidence was insufficient to prove each element of the charged offenses beyond a reasonable doubt (*see* Pet. at 17), that argument fails.

To sustain petitioner's conviction for first degree unlawful imprisonment (Count 2), the state had to prove that he restrained victim B under circumstances which exposed her "to a risk of serious physical injury."  N.Y. Penal Law §135.10; Dkt. No. 16 at SR 144-45.  To prove second degree menacing under Count 3 of the indictment, the state had to show that petitioner intentionally placed victim B in "reasonable fear of physical injury, serious physical injury, or death" by threatening to kill her and by restraining her and holding a knife to her throat.  N.Y. Penal Law §120.14(1); Dkt. No. 16 at SR 145.  "Physical injury" means "impairment of physical condition or substantial pain."  N.Y. Penal Law §10.00(9).  "Serious physical injury" means injury that "creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or

impairment of the function of any bodily organ."  N.Y. Penal Law §10.00(10).  Intent may be inferred from the circumstances, including the actions of the accused, and it may be proven by direct or circumstantial evidence.  *Horton v. Ercole*, 557 F. Supp. 2d 308, 321 (N.D.N.Y. 2008).

To prove fourth degree criminal mischief (Count 5), the state had to show that petitioner intentionally damaged victim B's car and he had no "right to do so nor any reasonable ground to believe" he had a right to do so.  N.Y. Penal Law §145.00(1); Dkt. No. 16 at SR 146.  To prove second degree kidnapping (Count 6), the state had to show that petitioner abducted victim B by "forcing her car off the road, smashing the driver's side window, forcibly removing" her "from her car, putting her in his vehicle and driving off with her," and taking her to a "secluded location where he raped and sodomized her."  N.Y. Penal Law §135.20; Dkt. No. 16 at SR 146-47.  "Abduct" means to restrain a person with the intent to prevent his or her liberation by either "secreting or holding" him or her "in a place where he [or she] is not likely to be found, or "using or threatening to use deadly physical force."  N.Y. Penal Law §135.00(2)(a), (b).

To prove first degree criminal sexual act as charged in Counts 8 through 10, the state had to prove that petitioner engaged in oral sexual conduct with victim B on three separate occasions on July 15, 2009 by forcible compulsion by "pinning her down with his body and then choking her with one hand while using his other hand to force his penis into her mouth[.]"  N.Y. Penal Law §130.50(1); Dkt. No. 16 at SR 147-49.  For Count 12, the state had to prove petitioner engaged in anal sexual conduct with victim B by forcible compulsion by "forcing her legs up in the air while she was on her back and forcing his penis into her anus."  N.Y. Penal Law §130.50(1); Dkt. No. 16 at SR 149-50.  To sustain petitioner's conviction for

first degree sexual abuse as alleged in Count 7 of the indictment, the state had to prove that

he subjected victim B to sexual contact by forcible compulsion by "grabbing her breasts with

one hand while he used his other hand to masturbate himself."  N.Y. Penal Law §130.65(1);

Dkt. No. 16 at SR 147.  To prove first degree rape (Count 11), the state had to prove that

petitioner engaged in sexual intercourse with victim B by forcible compulsion.  N.Y. Penal

Law §130.35(1); Dkt. No. 16 at SR 149.  Finally, to prove petitioner's guilt of driving while

intoxicated (Count 13), the state had to show that he operated his truck on a public highway

while he was in an "intoxicated condition."  N.Y. Veh. & Traf. §1192(3); Dkt. No. 16 at SR

150.

The Appellate Division summarized the evidence presented at trial, finding it sufficient

to establish the elements of each of the crimes charged in Counts 2 and 3 and 5 through 13:

> [V]ictim B testified that she and defendant began dating in May 2009. On the
> evening of July 14, 2009, she and defendant went to a local bar-known as the
> Trackside-around 10:00 p.m., where they remained for approximately 90
> minutes. During this time period, defendant consumed "quite a few" beers
> and/or mixed drinks and "a lot of shots" of alcohol. Defendant and victim B then
> left the Trackside, purchased a quantity of beer and went to a birthday party for
> her ex-boyfriend. During the early morning hours of July 15, 2009, defendant
> and victim B, both of whom had continued to drink at the birthday party,
> returned to the Trackside, where they remained until closing.
>
> Although defendant and victim B apparently had enjoyed a cordial evening up
> until this point, the two began to argue upon returning to victim B's residence in
> the Town of Pitcairn, St. Lawrence County. When victim B indicated that she
> was going to sleep on the couch, defendant became upset, prompting victim B
> to decide to leave the premises. Defendant, however, would not allow victim B
> to leave; after blocking her exit, taking her cell phone and shoving her,
> defendant pinned victim B to the ground with his knees against her shoulders,
> took out a pocket knife and dragged the blade across her face-all before
> pressing the blade to her throat and informing her that she "[had] to die" and
> that "he was going to kill [her]." Eventually, victim B persuaded defendant to
> release her so that she could let her animals outside to relieve themselves.
> After expressing concern over the welfare of one of her dogs, victim B
> convinced defendant to allow her to venture outside as well, whereupon she

managed to get to her vehicle and flee. Defendant gave chase, however, and-once he caught up with victim B-rammed her vehicle with his truck and forced her off the road. Defendant then punched out the driver's side window of victim B's vehicle, pulled her out of the car and "[t]ossed" her into the front passenger seat of his truck.

After reentering the truck, defendant reclined the front seat and pinned victim B down by placing his elbow to her collarbone. Following a brief struggle over the knife, which victim B succeeded in tossing out of the window of the truck, defendant began driving. Approximately 10 minutes later, victim B was allowed to sit up, at which point she recognized landmarks that placed her whereabouts in St. Lawrence County. As defendant continued to drive, they passed another motorist, who victim B recognized as a friend, prompting her to launch her hands and face out of the driver's side window and yell for help; defendant responded, "Great, now the cops are going to be called." Although victim B's friend turned around and began to follow defendant's truck, defendant "started driving faster" and the other vehicle faded from sight. As victim B pleaded for defendant to take her home, they approached an intersection with a stop sign, and victim B used this opportunity to "kick the shifter [lever] out of gear," exit the vehicle and begin running. After only "two or three steps," however, defendant caught up with victim B, informing her that "now [she was] really going to have to die." Defendant then dragged victim B back the truck and again began driving.

Eventually, defendant pulled over and announced that he wanted to get some sleep. Despite his stated intention, defendant thereafter grabbed victim B's breast before straddling her, pinning her down to the passenger seat and attempting to persuade her to perform oral sex. When victim B refused, defendant-on three separate occasions-placed his hands around victim B's throat and choked her; each time that victim B would gasp for air, defendant would force his penis into her mouth. Defendant then removed victim B's pants and forcibly engaged in vaginal and anal sex with her.

In the interim, victim B gained access to her cell phone and surreptitiously placed a call to 911. Eventually, victim B was able to provide clues as to her location, and defendant was successfully pulled over and apprehended by State Trooper Christopher Sharpe between the Towns of Fowler and Gouverneur in St. Lawrence County. Sharpe testified that he smelled alcohol "[a]s soon as [he] opened the door" to defendant's truck, State Trooper Michael Tyler testified that he observed two empty beer bottles-one next to and one inside of defendant's truck-and State Trooper Scott Freeman observed that defendant had "glassy eyes," a red face, impaired motor coordination and "a strong odor of alcohol emanating from him." Once back at the station, defendant did not respond to a request to submit to a chemical test. According to the experts who testified on defendant's behalf, defendant had a well-documented history of both alcohol

abuse and alcohol-induced blackouts.

*Hadfield*, 119 A.D.3d at 1220-22. The court further noted that "DNA testing found evidence of" petitioner's "sperm in victim B's anus and vagina." *Id.* at 1221 n. 4. Those findings are supported by the evidence presented at trial, and petitioner has not rebutted the presumption of correctness to which the Appellate Division's findings are entitled. Dkt. No. 16-2 at 929-54; Dkt. No. 16-5 at 609-653; Dkt. No. 16-6 at 654-667, 669-81, 684-90, 693-94, 702-741, 743-49, 777; Dkt. No. 16-7 at 900, 911-26, 927-28; Dkt. No. 16-8 at 955 -1002, 1005-1048, 1055-1072; *see Schriro*, 550 U.S. at 473.

Petitioner next argues that the charges contained in Counts 8 through 10 and 12 of the indictment were not proven because: (1) there was no proof that the crimes took place St. Lawrence County; and (2) there was no proof of a "continuing course of forcible compulsion," a theory not contained in the indictment. Pet. at 17-18. The Appellate Division considered and rejected these claims. *Hadfield*, 119 A.D.3d at 1221. The court explained that under New York Criminal Procedure Law ("CPL") §20.40(4)(g), "[a]n offense committed in a private vehicle during a trip thereof extending through more than one county may be prosecuted in any county through which such vehicle passed in the course of such trip." *Hadfield*, 119 A.D.3d at 1222 (alteration in original). The Appellate Division ruled that venue was established because, based on the record evidence, "the events in question began and ended in St. Lawrence County[.]" *Id.* That finding is also supported by the record. Victim B's residence, where the events began, was in St. Lawrence County. Dkt. No. 16-5 at 613. Victim B testified that while she was in the truck with petitioner, she recognized landmarks that placed her whereabouts in St. Lawrence County, and petitioner was apprehended in St. Lawrence County. Dkt. No. 16-5 at 648-49; Dkt. No. 16-6 at 669, 685, 687, 692; Dkt. No. 16-

7 at 898-90, 913, 927.  Victim B's 911 calls went to a Lewis County dispatcher.  Dkt. No. 16-5

at 517.  The dispatcher, Cheryl LaLonde, testified that she works "in conjunction with St.

Lawrence County," and that victim B "happened to be in St. Lawrence County."  *Id.*  Based on

the record, the Appellate Division's rejection of petitioner's venue claim was reasonable and

was not contrary to Supreme Court precedent.

Petitioner also argues the state failed to prove that he was intoxicated while he was

driving because over five and one-half hours passed between the time of his last drink and

the time he was stopped by police; the odor of alcohol was explained by the fact he had no

food and did not brush his teeth; although there were empty beer bottles in the truck, there

was no proof he consumed them in the truck, his glassy eyes and red face could be because

he was awake for over a full day and hit his head on the truck; and there was no field sobriety

test conducted.  Pet. at 19-20.  He also claims that, due to his state of mind, he could not

knowingly refuse to take the alco-sensor test.  *Id.*  The Appellate Division also considered and

rejected these claims and, on the record, this Court cannot say that decision was

unreasonable or contrary to clearly established Supreme Court precedent.  *See* Dkt. No. 16

at SR 59-61; *Hadfield*, 119 A.D.3d at 1219-20.

### 3.    Petitioner's affirmative defense - weight of the evidence

Petitioner's last claim is that he proved an affirmative defense of mental disease or

defect by a preponderance of the evidence and, accordingly, all of the charges related to the

July 2009 incident must be reversed.  Pet. at 20-23.  Petitioner presented this argument on

appeal as part of his sufficiency point (Dkt. No. 16 at SR 61-64) but he also referenced the

same arguments in a separate weight of the evidence claim (Dkt. No. 16 at SR 67-68). The

Appellate Division interpreted his argument as a "weight of the evidence" claim, and rejected

it. *Hadfield*, 119 A.D.3d at 1222.

"Weight of the evidence" claims derive from CPL § 470.15(5), which permits an appellate court in New York to reverse or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." N.Y. Crim. Proc. Law § 470.15(5); *People v. Bleakley*, 69 N.Y.2d 490 (1987). As previously noted, because weight claims are grounded in New York's criminal procedure statute, they are not cognizable on habeas review. *See* 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or treaty"); *McKinnon,* 422 F. App'x. at 75; *Maldonado,* 86 F.3d at 35; *see Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (habeas corpus review not available to remedy alleged error of state law); *Cummings v. Burge*, 581 F. Supp. 2d 436, 451-52 (W.D.N.Y. 2008) ("Since a 'weight of the evidence claim' is purely a matter of state law, it is not cognizable on habeas review.").

Moreover, to prove his affirmative defense, petitioner had to prove by a preponderance of the evidence that he suffered from a mental disease or defect and that, as a result, he lacked substantial capacity to know or appreciate the nature and consequences of his conduct, or that his conduct was wrong. N.Y. Penal Law §§ 25.00(2), 40.15. The Appellate Division summarized the evidence related to petitioner's affirmative defense:

> [T]he People and defendant each presented experts who, in turn, offered conflicting testimony as to defendant's mental health status and his capacity to comprehend the nature and consequences of his actions with respect to the incident involving victim B. In this regard, defendant's expert opined that defendant suffers from a borderline personality disorder and, when confronted with intense stress, will experience disassociative episodes, i.e., he will become "more than one person," during which time "[h]e doesn't know what he's doing." According to defendant's expert, defendant was experiencing such an episode during the early morning hours of July 15, 2009 when he abducted and

> brutalized victim B and, therefore, defendant "did not have the ability to comprehend the nature and consequences of his behavior or [to know] that it was wrong."
>
> The People's expert, however, although acknowledging that defendant has certain mental health issues, primarily focused upon defendant's well-documented history of alcohol and/or substance abuse, noting that defendant's underlying anger management and impulse control issues are exacerbated by his drinking. Based upon his interview with defendant, the People's expert concluded that defendant did not experience disassociative episodes except in relationship to alcohol-induced blackouts. Thus, even assuming that defendant's professed memory loss on the morning in question was genuine, the People's expert attributed such memory impairment to defendant's level of intoxication-as opposed to a true disassociative episode. Further, defendant's underlying history, coupled with his conduct immediately preceding and following his apprehension, led the People's expert to conclude that defendant "had substantial capacity to know what he was doing[,] . . . knew the nature and consequences of his action[s] . . . [and] also had substantial capacity to appreciate the wrongfulness of his action[s]."

*Hadfield*, 119 A.D.3d at 1222-23.  The court also noted that the People's expert addressed petitioner's behavior after he was apprehended, including that he was "observed banging his head against the side of his truck and attempting to bite a dog," and concluded this "'overly dramatic' behavior" was petitioner's "attempt at 'trying to look crazy.'"  *Id.* at 1223 n.5.

The Appellate Division explained "the case law makes clear that '[w]here conflicting expert testimony is presented, the question [of] whether the defendant suffered from a mental disease or defect at the time of the commission of the crime is for the fact finder, who may accept or reject the opinion of any expert.'"  *Hadfield*, 119 A.D.3d at 1222 (quoting *People v. Capela*, 97 A.D.3d 760, 761 (2012), *lv denied* 19 N.Y.3d 1024 (2012) (alteration in original)). Because the Appellate Division discerned no "'serious flaw' in the opinion offered by the People's expert," it was "unable to conclude that the jury, in crediting such testimony, 'failed to give the evidence the weight it should be accorded.'"  *Id.* at 1223 (quoting *People v. Tillman*, 260 A.D.2d 656, 657 (1999) (internal quotation marks and citation omitted). This

Court may not disturb that finding on habeas review. *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (section "2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."); *James v. Lord*, No. 1:94-CV-00195, 1995 WL 818853 at *3 (W.D.N.Y. Jun. 22, 1995) (rejecting claim that petitioner's conviction was against the weight of the evidence because she proved at trial that she lacked substantial criminal responsibility by reason of mental disease or defect, because the claim implicated the weight of the evidence and "it is the province of the jury, and the state appellate court on direct review of the record, to weigh and resolve conflicts in the evidence presented at trial[.]").

In sum, Ground Three of the petition is denied and dismissed in its entirety.

### E.    Ground Four - Trial Counsel's Effectiveness

In Ground Four of his petition, petitioner claims that trial counsel was ineffective because he: (1) failed to move to sever the crime involving victim A from those involving victim B; (2) told the court petitioner declined the People's plea offer without stating on the record the details of the offer, which deprived petitioner of "meaningful choice as to whether to plead guilty and an argument on appeal that he was punished for exercising his right to trial; and (3) failed to object to Trooper White's comment that he previously took petitioner to an unrelated arraignment.  Pet. at 24-26.

### 1.  Claims 2 and 3 (as numbered above) are unexhausted and procedurally defaulted.

An application for a writ of habeas corpus may not be granted until a petitioner exhausts all remedies available in state court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the

27

rights of the applicant."  28 U.S.C. § 2254 (b)(1)(A), (B)(I), (ii).  The exhaustion requirement "is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings[.]"  *Jimenez v. Walker*, 458 F.3d 130, 149 (2d Cir. 2006) (quoting *Rose v. Lundy*, 455 U.S. 509, 518 (1982)).

To properly exhaust his claims, petitioner must do so both procedurally and substantively.  Procedural exhaustion requires that he raise all claims in state court prior to raising them in a federal habeas corpus petition.  Substantive exhaustion requires that the petitioner "fairly present" each claim for habeas relief in "each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim."  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted).  Petitioner must also use the proper procedural vehicle so that the state court may pass on the merits of his claims.  *Dean v. Smith*, 753 F.2d 239, 241 (2d Cir. 1985).

Here, petitioner raised all of his ineffective assistance arguments on direct appeal, and the Appellate Division rejected them.  Dkt. No. 16 at SR 68-72, Appellate's Brief; *Hadfield*, 119 A.D.2d at 1222.  He sought leave to appeal to the New York Court of Appeals, but he did not raise all of his ineffective assistance arguments in his leave application.  Dkt. No. 14 at SR 1-6 and Dkt. No. 16 at SR 517-21, Leave Letter.  Instead, appellate counsel focused on only one of those claims: counsel's failure to move to sever the crime involving victim A from those involving victim B.  *See* Dkt. No. 14 at SR 5-6; Dkt. No. 16 at SR 520-21; *see also* Dkt. No. 14 at SR 9-10 and Dkt. No. 16 at SR 525-26, Letter in Rebuttal.  Because appellate counsel argued only one of petitioner's ineffective assistance claims at length in the leave application, and did not ask the Court of Appeals to review all claims raised in the Appellate Division, the remaining two ineffective assistance claims were not fairly presented to the New

28

York Court of Appeals.  Claims 2 and 3 are, therefore, unexhausted.  *See Galdamez v. Keane*, 394 F.3d 68, 74-75 (2d Cir. 2005) (holding that when a defendant files a leave letter to the New York Court of Appeals, attaching his appellate briefs, and requesting the Court to consider all the arguments in the appellate brief without specifying any particular issues, the defendant fairly presented all the claims in the Appellate Brief); *Ramirez v. Atty. Gen., Stat of N.Y.*, 280 F.3d 87, 96, 97 (2d Cir. 2001) (explaining that "the factual basis for an ineffective assistance claim must, like other issues, be presented to all relevant state courts" and "[r]eferences to attached briefs without more will preserve issues only if the Court of Appeals is clearly informed that the reference is asserting issues in those briefs as bases for granting leave to appeal."); *Jordan v. LeFevre*, 206 F.3d 196, 198 (2d Cir. 2000) ("Arguing a single claim at length and making only passing reference to possible other claims to be found in the attached briefs does not fairly apprise the state court of those remaining claims."); *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) (if a petitioner's leave application specifically requested review of only one claim, all other claims would be deemed procedurally defaulted, even though the petitioner included his appellate brief in which the other claims were raised).

There is no remaining avenue by which petitioner could properly exhaust claims 2 and 3 in state court.  He cannot now file a direct appeal or leave application in order to exhaust them because a defendant is "entitled to one (and only one) appeal to the Appellate Division," and one application for leave to appeal to the Court of Appeals.  *Aparicio v. Artuz*, 269 F.3d 78, 91 (2d Cir. 2001); *Grey*, 933 F.2d at 120.  If petitioner filed a CPL §440.10 motion in an attempt to exhaust these claims, the state court would have to deny the motion because the Appellate Division rejected all of them on the merits.  *Hadfield*, 119 A.D.3d at 1222; *see* CPL §440.10(2)(a) (a state court "must deny" a motion to vacate a judgment when "[t]he ground or

issue raised upon the motion was previously determined on the merits upon an appeal from the judgment, unless since the time of such appellate determination there has been a retroactively effective change in the law controlling such issue.").  Since no remaining avenue exists in which petitioner could properly present his claims, claims 2 and 3 are deemed exhausted but procedurally defaulted.  *Coleman v. Thompson*, 501 U.S. 722, 732 (1991); *Aparicio*, 269 F.3d at 90.

Procedurally defaulted claims are not subject to habeas review unless a petitioner shows cause for the default and actual resulting prejudice, or that the denial of habeas relief would result in a fundamental miscarriage of justice, *i.e.*, that he is actually innocent.  *House v. Bell*, 547 U.S. 518, 536-39 (2006); *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *see Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) ("Actual innocence means factual innocence, not mere legal insufficiency.") (citation omitted).  To establish cause, petitioner must show that some objective external factor impeded his ability to comply with the relevant procedural rule.  *Maples v. Thomas*, __U.S.__, 132 S. Ct. 912, 922 (2012); *Coleman*, 501 U.S. at 753.  If a petitioner fails to establish cause, a court need not decide whether he suffered actual prejudice, because federal habeas relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated.  *See Murray v. Carrier*, 477 U.S. 478, 496 (1986) (referring to the "cause-and-prejudice standard"); *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985) (same).

Petitioner does not assert any basis for finding cause to excuse the default of claims 2 and 3, and the Court discerns none.  *See Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994) (concluding that petitioner did not satisfy the cause and prejudice showing where he did not give any reason for failing to properly exhaust his federal claim in state court).  He did not

argue appellate counsel was ineffective for failing to present these claims in his leave letter in any state court, and he does not make that argument now.  *See* Pet; *Carrier*, 477 U.S. at 488-89 (the "exhaustion doctrine . . . generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.") (internal citation omitted).  Since petitioner failed to establish cause, the Court need not decide whether he will suffer actual prejudice before foreclosing habeas review.  *Id.* at 496; *Stepney*, 760 F.2d at 45.

Finally, petitioner does not argue that he is "actually innocent," and he has not proffered any new evidence that would make a reasonable jury doubt his guilt.  *See Schlup*, 513 U.S. at 329 ("[A]ctual innocence . . . does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty.").

In sum, without a showing of cause and prejudice, or a fundamental miscarriage of justice, this Court must bar consideration of two of petitioner's ineffective assistance claims.  Therefore, claims 2 and 3 are dismissed.

**2.      Claim 1 does not warrant federal habeas relief.**

The Appellate Division rejected petitioner's remaining claim that counsel was ineffective for failing to move to sever the crime involving victim A from those involving victim B.  *Hadfield*, 119 A.D.3d at 1224.  That decision was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

"To establish ineffective assistance of counsel 'a defendant must show both deficient performance by counsel and prejudice.'"  *Premo*, 562 U.S. at 121 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)); *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

A petitioner must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ... [and] that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  Even if a petitioner can establish that counsel was deficient, he still must show that he suffered prejudice.  *Id.* at 693-94.

Meeting this burden is "never an easy task . . . [and] establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult."  *Premo*, 562 U.S. at 121-22 (citations and internal quotation marks omitted).  When reviewing a state court's decision under section 2254, "[t]he question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable-a substantially higher threshold."  *Knowles*, 556 U.S. at 123 (internal quotation marks and citation omitted).  Federal habeas courts "must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)" because "[w]hen §2254(d) applies, the question is not whether counsel's actions were reasonable."  *Richter*, 562 U.S. at 105.  Instead, "the question is whether there is any reasonable argument that counsel satisfied *Strickland* 's deferential standard."  *Id.*

In this case, the Appellate Division ruled that "the record discloses valid strategic reasons for not requesting a severance of the counts set forth in the indictment."  *Hadfield*, 119 A.D.3d at 1224.  First, the Appellate Division found a severance motion would "likely have been futile[.]"  *Id.*  Under CPL §200.20(2)(c), offenses are joinable when they are "defined by the same or similar statutory provisions and consequently are the same or similar in law."  A court may order that charges joined under CPL §200.20(2)(c) be tried separately "in the interest of justice and for good cause shown."  CPL §200.20(3).  Good cause may be

established by demonstrating that there is '[s]ubstantially more proof on one or more such joinable offenses than on others and there is a substantial likelihood that the jury would be unable to consider separately the proof as it relates to each offense;" or that the defendant has "both important testimony to give concerning one count and a genuine need to refrain from testifying on the other, which satisfies the court that the risk of prejudice is substantial." CPL §200.20(3)(a), (b).

Petitioner was charged with first degree criminal sexual act related to victim A and four counts of that same crime related to victim B.  Dkt. No. 16 at SR 144-50, Indictment.  New York courts often deny severance motions under similar circumstances.  *See, e.g., People v. Hunt*, 39 A.D.3d 961, 962 (3d Dep't. 2007) (finding that county court did not abuse its discretion in denying severance motion because "[a]lthough the charges in the indictment involved three different victims and were based upon incidents that occurred months apart from one another, the charges were statutorily joinable as offenses 'defined by the same or similar statutory provisions and consequently . . . the same or similar in law.'") (citations omitted), *lv. denied* 9 N.Y.3d 845 (2007); *People v. Clark*, 24 A.D.3d 1225, 1226 (4th Dept. 2005) (ruling that rape and sodomy charges were properly joined "because they are defined by the same or similar statutory provisions and consequently are the same or similar in law" even though the charges involved different victims), *lv. denied* 6 N.Y.3d 832 (2006); *People v. Reome*, 309 A.D.2d 1067, 1068 (3d Dep't. 2003) (no abuse of discretion in denying severance motion in case involving "a 12-count indictment with various sex-related, coercion and child endangerment crimes stemming from separate incidents involving a 10-year-old boy (hereinafter the boy) and a 16-year-old girl (hereinafter the victim), during the summer of 1998."), *lv. denied* 2 N.Y.3d 805 (2004).

Petitioner argues that the issue regarding the charge related to victim A was credibility and the issue regarding the charges related to victim B was whether he suffered from a mental disease or defect.  Pet. at 25.  He asserts that "a juror, not sure of petitioner's mental disease defense, could have simply determined that because petitioner was worthy of punishment in regard to his behavior toward" victim A, "he was also guilty regarding" victim B, and that the inverse could have occurred.  *Id.*  The problem with petitioner's argument is that, after much discussion, the trial court permitted petitioner to advance the mental disease or defect defense on all charges, not just those relating to victim B.  *See* Dkt. No. 16-9 at 1349-53; Dkt. No. 16-10 at 1354-62.  As the Appellate Division ruled, "by trying the offenses as to victims A and B together, defendant was able to assert his affirmative defense of not guilty by mental disease or defect as to both the 2008 and 2009 offenses-notwithstanding the virtual absence of testimony regarding his mental state at the time he committed the crime against victim A in 2008."  *Hadfield*, 119 A.D.3d at 1222.  That decision, supported by the record and entitled to AEDPA deference, was not contrary to Supreme Court precedent.  *Strickland v. Washington*, 466 U.S. at 690, 694; *McKee v. United States*, 167 F.3d 103, 106 (2d Cir. 1999) ("actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance and a court may not use hindsight to second-guess counsel's tactical choices") (internal quotation and citations omitted); *Smith v. Unger*, No. 1:13-CV-5485, 2014 WL 2567099 at *19 (S.D.N.Y. Jun. 9, 2014) ("That a trial strategy ultimately fails does not in itself demonstrate that counsel was ineffective."), *adopted* 2014 WL 7008949 (E.D.N.Y. Dec. 12, 2014).

Even assuming counsel's performance was deficient, petitioner failed to demonstrate prejudice, i.e., that but for counsel's error, he would have been acquitted of any of the

charges. *See Richter*, 562 U.S. at 104 ("[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding ... Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'") (quoting *Strickland*, 466 U.S. at 693, 697); *Strickland*, 466 U.S. at 695 ("When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.").

In sum, under the highly deferential AEDPA standards applicable to ineffective assistance claims, this Court cannot say that the Appellate Division unreasonably applied *Strickland* in ruling that counsel's actions constituted sound strategy. Claim 1 is therefore denied and dismissed.

## IV.    CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that the petition, Dkt. No. 1, is **DENIED and DISMISSED;** and it is further

**ORDERED** that no Certificate of Appealability ("COA") shall issue because petitioner failed to make a "substantial showing of the denial of a constitutional right" as 28 U.S.C. § 2253(c)(2) requires;[3] and it is further

---

[3] *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that, if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, and (2) that the applicant has established a valid constitutional violation" (citation omitted)).

**ORDERED** that the Clerk serve copies of this Decision and Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Dated: December 19, 2016
        Albany, NY

Mae A. D'Agostino
U.S. District Judge